**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CCUR ACQUISITION II, LLC AND CCUR HOLDINGS, INC., | Index No. |
| Plaintiffs, | |
| -against- | **COMPLAINT** |
| LIGHTFOOT PC LLC, RICHH LLC, RICHARD HORNSTROM, and JAMES MARTIN, | |
| Defendants. | |

Plaintiffs CCUR Holdings, Inc. ("CCUR Holdings"), and CCUR Acquisition II, LLC ("CCUR Acquisition", and collectively with CCUR Holdings, "CCUR") by and through their attorneys, Davis+Gilbert LLP, for their Complaint against defendants Lightfoot PC LLC ("Lightfoot"), Richh LLC ("Richh"), Richard Hornstrom ("Hornstrom"), and James Martin ("Martin", and together with Lightfoot, Richh, and Hornstrom, the "Sellers" or "Defendants") state as follows:

## NATURE OF THE ACTION

1.      This is an action to enforce the terms of a purchase agreement related to the recent sale of a transportation and logistics company, Quick Trip Express Freight Service Inc. ("Quick Trip").

2.      In late-2023, CCUR became interested in acquiring Quick Trip, which provides cartage, drayage, transload, and long-and-short-term warehouse storage in the Central Florida region.

3.      Quick Trip and the Sellers marketed the company to CCUR as a stable, cash flow-positive business.  To that end, during due diligence, Quick Trip provided CCUR with certain financial information which purported to show a company well positioned for long-term success.

4.      On the basis of the information represented by the Sellers and Quick Trip during the due diligence process—including information provided in financial statements—on January 19, 2024, CCUR entered into a Stock Purchase Agreement (the "Purchase Agreement") with Quick Trip and the Sellers, through which CCUR acquired Quick Trip in exchange for nearly $4 million.

5.      The Purchase Agreement contained numerous representations and warranties (each an "R&W" and collectively, the "R&Ws") by the Sellers, including that certain financial information provided to CCUR was accurate.  The Sellers also agreed to indemnify CCUR for breaches of the R&Ws or fraud.

6.      After acquiring Quick Trip, it quickly became clear that CCUR had been misled about Quick Trip's financial circumstances and future viability.  Indeed, CCUR has learned that much of the information—including fundamental financial information—provided about Quick Trip during the due diligence process was false and/or misleading.

7.      When these misrepresentations were uncovered and brought to the attention of Quick Trip's then-CEO, upon information and belief, he fled to Poland and has apparently gone into hiding.

8.      Rather than receive what it paid nearly $4 million for—a multimillion-dollar company with a bright future—CCUR instead received a foundering company, which was quickly unable to meet its basic financial obligations.

9.      As a result, CCUR has suffered damages amounting to the loss of the entire purchase price.  Pursuant to the Purchase Agreement, the Sellers agreed and are obligated to indemnify CCUR for such losses.

10.      One consequence of Quick Trip's financial dire straits is that it is in arrears on its rent payments.

11.      Prior to CCUR's acquisition of Quick Trip, Hornstrom personally guaranteed Quick Trip's lease for the real property located at 5416 W Sligh #106, Tampa, Florida 33634 (Quick Trip's "Headquarters and Warehouse"), for the benefit of the lessor (the "Lessor").

12.      As part of the Purchase Agreement, CCUR Holdings agreed with Hornstrom to assume his duties and obligations pursuant to that guaranty.  CCUR Holdings' agreement with Hornstrom was memorialized in a letter agreement, dated January 19, 2024, and executed contemporaneously with the Purchase Agreement (the "Letter Agreement").

13.      However, the Lessor never consented to the assignment and assumption of Hornstrom's guaranty, and CCUR Holdings and Hornstrom subsequently agreed, on April 11, 2024, to enter into an Assignment and Assumption Agreement (the "Assignment Agreement" and, collectively with the Letter Agreement, the "Assignment").

14.      The Lessor has threatened to enforce the guaranty and seek the unpaid rent from Hornstrom.  In turn, Hornstrom has informed CCUR Holdings that he will attempt to enforce the Assignment.

15.      CCUR Holdings would have never entered the Assignment but for the fraudulent misrepresentations made in connection with the acquisition of Quick Trip, and thus should not be bound by the Assignment, which should be rescinded.

16.     Accordingly, there is a ripe dispute between CCUR Holdings and Hornstrom related to the Assignment.

17.     Plaintiffs seek, among other things, indemnification from the Sellers for losses, including but not limited to compensatory damages, reasonable attorneys' fees, costs of investigation, and interest, and a declaration that the Assignment is voidable and has been rescinded because of fraud in the inducement.

## PARTIES

18.     Plaintiff CCUR Holdings is a corporation duly formed pursuant to the laws of the State of Delaware, having its principal place of business in Texas.  CCUR Holdings operates in the financial services and real estate sectors.

19.     Plaintiff CCUR Acquisition is a wholly owned subsidiary of CCUR Holdings, created for the purpose of acquiring Quick Trip.  CCUR Acquisition is a Delaware Limited Liability Company.

20.     Defendant Lightfoot is a Florida Limited Liability Company.  Lightfoot has a single member, Martin.

21.     Defendant Martin is an individual domiciled in the state of Florida.

22.     Defendant Richh is a Florida Limited Liability Company.  Richh has a single member, Hornstrom.

23.     Defendant Hornstrom is an individual domiciled in the state of Florida.

## JURISDICTION AND VENUE

24.     This Court has personal jurisdiction over each of the Defendants because they are parties to the Purchase Agreement and agreed therein to consent to personal jurisdiction in New York.

25.     The Purchase Agreement provides at Section 9.08(b) that "[a]ny Action arising out of or based upon this Agreement," or certain "Ancillary Documents," including the Assignment, "may be instituted only in the Federal Courts of the United States of America or the courts of the State of New York in each case located in the City of New York and Borough of Manhattan, and each party irrevocably submits to the exclusive jurisdiction of such courts."

26.     Venue is likewise proper in this District pursuant to the parties' consent in Section 9.08(b) of the Purchase Agreement and pursuant to 28 U.S.C. § 1391(b)(3).

27.     In addition, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), because there is complete diversity among the parties (i.e. Plaintiffs are citizens of different states than each Defendant), and the amount in controversy exceeds $75,000, exclusive of interest and costs.

28.     CCUR Acquisition is a Limited Liability Company, with CCUR Holdings as its sole member.  CCUR Holdings is a Delaware corporation with a principal place of business in Texas.  Therefore, both CCUR Holdings and CCUR Acquisition are citizens of the states of Delaware and Texas.

29.     Martin is domiciled in Florida, and therefore is a citizen of the state of Florida.

30.     Lightfoot is a Limited Liability Company, with Martin as its sole member. Therefore, Lightfoot is a citizen of Florida.

31.     Hornstrom is domiciled in Florida, and therefore is a citizen of the state of Florida.

32.     Richh is a Limited Liability Company, with Hornstrom as its sole member. Therefore, Richh is a citizen of the state of Florida.

33.     Because Plaintiffs are citizens of the states of Delaware and Texas, and all Defendants are citizens of the state of Florida, there is complete diversity among the parties.

34.     In addition, CCUR seeks not less than $3.7 million in damages, which far exceeds $75,000.

## FACTUAL ALLEGATIONS

A.      CCUR Holdings Considers an Acquisition of Quick Trip and Conducts Due Diligence

35.     In late 2023, CCUR Holdings became interested in acquiring Quick Trip which provides cartage, drayage, transload, and long-and-short-term warehouse storage in the Central Florida region.  CCUR Holdings believed that Quick Trip presented a potentially exciting opportunity to invest in a roll-up in the third party logistics industry.

36.     Prior to agreeing to an acquisition, however, CCUR conducted due diligence into Quick Trip and its finances.

37.     During the due diligence process, Quick Trip's former Chief Executive Officer, Justin Taylor ("Taylor"), and an accountant providing services to Quick Trip, Hannah Caparaso ("Caparaso")[1], gave CCUR access to Quick Trip's online QuickBooks account, bank account statements, and reports from Crown (a transportation management system which Quick Trip used for billing, recording invoices, and tracking accounts receivable).

38.     Additionally, Quick Trip provided CCUR with a balance sheet and certain financial statements data as of December 31, 2023.

39.     Quick Trip also provided a variety of other types of financial information including: 1) historical revenue numbers for November 2023 and December 2023; 2) Quick Trip's accounts receivable balances and accounts receivable (AR) aging reports; and 3) projections and forecasts for 2024 along with purported then-present facts upon which such projections were based.

---

[1] Hornstrom represented to CCUR that Caparaso was his personal tax accountant and that he had put her in charge of Quick Trip's accounting.  Upon information and belief, Caparaso was then employed as Head of Accounting at David A. Bastian CPA.  CCUR does not know if Caparaso was ever employed by Quick Trip, but she has not been at any time since the acquisition.

40.     The financial information provided to CCUR during due diligence was critical to CCUR's evaluation of a potential deal.

41.     As such, CCUR retained an investment-banking advisor, B. Riley Advisory Services ("B. Riley"), to analyze the financial information that Quick Trip provided.  B. Riley also received access to Quick Trip's online QuickBooks account, bank account statements, and reports from Crown.

42.     The information provided in the due diligence process portrayed Quick Trip as a thriving business with the potential for significant growth.

43.     Taylor and the Sellers intended that CCUR would rely on the information provided in the due diligence process.

44.     Indeed, CCUR relied upon the information provided in the due diligence process, and attempted to verify such information through its engagement of B. Riley.

45.     It was reasonable for CCUR to rely upon the information provided in the due diligence process and CCUR made efforts—through the engagement of B. Riley—to verify the information, to the extent possible.

46.     CCUR did not know—and had no reason to believe based on B. Riley's review or otherwise—that the information provided in the due diligence process was false in any respect.

47.     Accordingly, based on the evaluation of the information provided in the due diligence process, CCUR agreed to a multi-million dollar purchase price for Quick Trip.

B.     The Parties Enter into a Purchase Agreement

48.     Following the completion of due diligence, on January 19, 2024 the parties entered into the Purchase Agreement.  A true and correct copy of the Purchase Agreement is included as Exhibit 1 to this Complaint.

49.     The Purchase Agreement contained a purchase price of $4 million.  At the close of the transaction, CCUR Acquisition disbursed $3,823,062.98, excluding $150,000.00 deposited in escrow for the net working capital adjustment.  Following the process outlined in the Purchase Agreement, in April 2024, CCUR provided Hornstrom an updated Annex A that showed a materially lower working capital figure.  In response, Hornstrom remitted $110,000.00 to CCUR via check, and the $150,000.00 in escrow was released to CCUR, reducing the total amount paid to approximately $3.7 million.   CCUR subsequently realized that the April estimate was still inflated, as further investigation has revealed: 1) material additional inaccuracies in the amounts; and 2) material additional amounts that have proven to be uncollectable.

50.     In exchange for the purchase price, CCUR Acquisition acquired all interests in Quick Trip.

51.     In the Purchase Agreement, the Sellers provided certain R&Ws.  In particular, pursuant to Section 3.05(a) of the Purchase Agreement, the Sellers made the following representation:

> Complete copies of [Quick Trip's] financial statement consisting of the balance sheet as at December 31 2023 and the related statement of income and cash flow (the "Financial Statement") has been provided to Buyer.  The balance sheet of the Company as of December 31, 2023 is referred to herein as the "Balance Sheet" and the date thereof as the "Balance Sheet Date."  The Financial Statement has been prepared on the basis of the same accounting principles, policies, methods, and procedures, consistently applied throughout the periods involved.  The Financial Statement is based on the books and records of the Company, and fairly presents in all material respects the financial condition of the Company as of the date it was prepared and the results of the operations of the Company for the period indicated.

*See* Ex. 1 § 3.05(a).

52.     Therefore, the Sellers represented and warranted that the Financial Statement and Balance Sheet "fairly presented" in all "material respects" the "financial condition" of Quick Trip.

8

53.     Additionally, Section 3.05(b) of the Purchase Agreement, included the following R&W from the Sellers: "[t]he Company does not have any material liabilities, obligations, or commitments of any nature whatsoever, whether asserted, known, absolute, accrued, matured, or otherwise (collectively, "Liabilities"), including guarantees by the Company of Liabilities of any other Person, except (i) Liabilities as and to the extent reflected on the Balance Sheet as of the Balance Sheet Date, (ii) Liabilities incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date, (iii) and obligations not in default under Contracts entered into by the Company in the ordinary course of business consistent with past practice." *See* Ex. 1 § 3.05(b).

54.     Further, Section 3.05(c) of the Purchase Agreement, included the following R&W from the Sellers: "[t]he accounts receivable reflected on the Balance Sheet and the accounts receivable arising after the Balance Sheet Date have arisen from bona fide transactions entered into by [Quick Trip] involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice." *See* Ex. 1 § 3.05(c).

55.     Pursuant to Section 8.02(a) of the Purchase Agreement, each of the Defendants (defined in the Purchase Agreement as the "Seller Indemnitors") agreed to indemnify CCUR Acquisition for any "Losses" (as defined in the Purchase Agreement) resulting from "any inaccuracy in or breach of any of the representations or warranties" made by the Sellers, including the R&Ws contained in Section 3.05. *See* Ex. 1 § 8.02(a).

56.     Pursuant to Section 8.02(d) of the Purchase Agreement, each of the Defendants further agreed to indemnify CCUR for any "Losses" resulting from "any fraud." *See* Ex. 1 § 8.02(d).

57.     "Losses" is broadly defined by the Purchase Agreement as "losses, damages, Liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees, the cost of investigation or defense, the cost of asserting, preserving, or enforcing any rights under this Agreement or any Ancillary Document, including the right to indemnification hereunder, and the cost of pursuing any insurance providers." *See* Ex. 1 Annex A.

58.     The Purchase Agreement also contemplated that the parties would enter other contracts (specifically, "Ancillary Documents") to effect the acquisition of Quick Trip by CCUR.

59.     Pursuant to Section 9.03 of the Purchase Agreement, titled "Entire Agreement," the parties agreed that "[t]his Agreement, including Annexes, Schedules, and Exhibits, and the Ancillary Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter." *See* Ex. 1 § 9.03.

60.     "Ancillary Documents" is defined by the Purchase Agreement as "the Escrow Agreement, the Bill of Sale and Assignment and Assumption Agreement and *all other agreements and certificates executed and delivered by or on behalf Buyer, the Sellers, or the Company in connection with this Agreement or the Contemplated Transactions*." *See* Ex. 1 Annex A (emphasis added).

61.     Finally, the parties agreed that the Purchase Agreement, and any related disputes, would be governed by New York law. *See* Ex. 1 § 9.08(a).

C.     CCUR Learns That it Has Been Defrauded After Acquiring Quick Trip

62.     CCUR took control of Quick Trip after the Purchase Agreement was executed.  It soon became clear to CCUR that Quick Trip's financial situation was not as represented and warranted by the Sellers.

63.     In particular, CCUR learned that the revenue numbers and the historical financial information provided by Quick Trip were inaccurate.

64.     Quick Trip had materially inflated its total accounts receivable information, which resulted in significantly less cash flow than expected.

65.     For example, on December 2, 2023, Taylor had sent CCUR reports reflecting that Quick Trip earned $359,223 in revenue for November 2023.  In reality, Quick Trip's November 2023 revenue was only $317,391.63.

66.     Similarly, on January 4, 2024, Taylor had informed CCUR that Quick Trip had earned $416,555 in revenue in December 2023.  In reality, Quick Trip's December 2023 revenue was only $384,868.00.

67.     These inflations to revenue were sufficient to portray Quick Trip as a cash-positive business when it was actually hemorrhaging cash.

68.     CCUR discovered that there were at least three operational issues that led to overstated revenues and accounts receivables: (1) prior to the acquisition and afterwards, payments were regularly not being properly applied in the Crown Payment Journal, i.e. Quick Trip would deposit a check or receive an ACH payment, but the corresponding invoice was not being marked "as paid" in Crown and therefore the receivable would remain "outstanding"; (2) some invoices were being double-booked in Crown, leading to improperly inflated accounts receivable and, thus,

revenues; and, (3) there were simple billing mistakes that were disputed by customers (such as errors in the rate or revenue split).

69.     Indeed, while the Balance Sheet stated Quick Trip had an AR balance of $716,469.00, this was false.  CCUR has not yet been able to determine the accurate amount of accounts receivable, but it was certainly below that amount, likely hundreds of thousands of dollars less.

70.     Some of the misrepresentations were even more straightforward.  During the due diligence process, Taylor represented that a new customer, Pilot Freight, had begun to generate revenue at a rate that would amount to approximately $20,000 per week in revenue, or over $1 million in total in 2024.

71.     The representations regarding increased revenue driven by business from Pilot Freight were one of the core assumptions underlying multiple forecasts provided to CCUR during the due diligence process.

72.     Those forecasts showed that Quick Trip would generate approximately $6 million of revenue and $1 million of EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization) in 2024.

73.     But the representations about revenue from Pilot Freight were false.  Through April 2024, Quick Trip collected only approximately $50,000 in revenue from Pilot Freight.

74.     Revenue inflation was not the only form of Quick Trip's financial manipulation. During due diligence and through the close of the transaction, Taylor represented that there was excess net working capital in the business.  This representation also proved to be false.

75.     Taylor's claim that there was excess net working capital suggested that in the months following the acquisition, the excess accounts receivable should convert to excess balance sheet cash, which never happened because the accounts receivables were falsely reported.

76.     Quick Trip also misrepresented the nature of certain prior capital contributions. During the due diligence process, CCUR and B. Riley identified three cash equity contributions from Sellers to Quick Trip in May, August, and September 2023, of $600,000, $100,000, and $106,250 respectively.

77.     Quick Trip informed CCUR that these equity contributions were associated with a June 2023 acquisition of another cartage company, H&E. CCUR ultimately learned that a material part of these contributions was used to fund Quick Trip's operating expenses.

78.     By misrepresenting the nature of the capital infusions, Taylor was able to mask Quick Trip's on-going revenue shortfalls.

79.     In particular, the capital infusions hid the fact that Quick Trip's accounts receivable could not be collected and therefore, indirectly, that revenue, profits, and accounts receivables balances were falsely overstated.

80.     Additionally, certain costs were reflected in Quick Trip's Financial Statement as non-recurring costs, when in fact they were recurring.

81.     For example, $94,384.00 of rebate payments were categorized as non-recurring payments in December 2022, leading CCUR to believe that Quick Trip was cash flow breakeven on an actual historical basis (adjusting for one-time costs), when it reality Quick Trip had negative cash flow.

82.     CCUR learned soon after the transaction closed that, as a result of the above misrepresentations, Quick Trip faced an immediate liquidity crunch.

83.     Quick Trip also materially misrepresented its accounts payable.  In the Balance Sheet, Quick Trip stated that there were no accounts payable (i.e. $0).  In fact, Quick Trips understated accounts payable by more than $100,000.  Therefore, while the Balance Sheet stated that Quick Trip had no accounts payable liability, it actually owed more than $100,000.

84.     Moreover, Taylor materially misrepresented certain other aspects of the business, specifically related to standard operating procedures.  Taylor told CCUR that Quick Trip had standard processes in place to handle billing, collections, data entry, and customer service.  However, CCUR ultimately learned there were no such collections processes.

85.     Taylor—and potentially the Defendants—knew each of the identified representations concerning Quick Trip to be false and/or misleading.

86.     Once CCUR learned the truth of Quick Trip's dire financial circumstances and confronted Taylor about the discrepancies, upon information and belief, Taylor fled the country and is currently believed to be in hiding in Poland.

87.     Importantly, certain of the above misrepresentations, among other falsehoods, rendered the Financial Statement and Balance Sheet (as defined in § 3.05(a) of the Purchase Agreement) false and/or misleading, as they did not "fairly present in all material respects the financial condition" of Quick Trip.

88.     Upon information and belief, Quick Trip currently has a negative value.  As a result of the numerous misrepresentations about the financial condition of the Quick Trip, the company started exhibiting symptoms of financial distress within the first few weeks following the acquisition.  Despite significant efforts to turn the business around, its financial condition has only worsened.

89.     CCUR had been sold a failing company with no prospect of future viability.

D.      The Assignment and Hornstrom's Intent to Enforce its Terms

90.      As part of the acquisition, CCUR took over the lease for Quick Trip's Headquarters and Warehouse.

91.      Hornstrom had previously executed a guaranty with Quick Trip's Lessor related to such lease, through which, *inter alia*, he agreed to personally guarantee Quick Trip's rent obligations (the "Guaranty").

92.      The parties sought to address the Guaranty in connection with the transaction and the Purchase Agreement.

93.      Accordingly, contemporaneous with the Purchase Agreement, on January 19, 2024, Hornstrom and CCUR Holdings executed the Letter Agreement.  A true and correct copy of the Letter Agreement is included as Exhibit 2 to this Complaint.

94.      However, the Lessor ultimately did not agree to the assignment pursuant to the Letter Agreement and therefore Hornstrom's Guaranty agreement with the Lessor remained in effect.

95.      Accordingly, on April 11, 2024, CCUR Holdings and Hornstrom executed the Assignment Agreement.  A true and correct copy of the Assignment Agreement is included as Exhibit 3 to this Complaint.

96.      The Assignment Agreement provided that, "in consideration of the mutual promises set forth in the Purchase Agreement," CCUR Holdings would assume Hornstrom's obligations under the Guaranty.  *See* Ex. 3 ¶ 2.

97.      Thus, in the event Quick Trip failed to make a rent payment, the Lessor would have a remedy against Hornstrom, and Hornstrom in turn would seek to pass that obligation on to CCUR Holdings pursuant to the Assignment.

98.     CCUR Holdings was fraudulently induced into the Assignment in that it agreed to assume the lease guaranty in reliance on the truth of the representations in the Purchase Agreement and throughout the due diligence process.

99.     Due to Quick Trip's dire financial circumstances, it has been unable to make payments necessary for its operations, been forced to stretch payables, and fallen behind in rent for both of its warehouses.  In particular, Quick Trip is in arrears on rent due for its Headquarters and Warehouse, in the amount of $200,000 (the "Overdue Rent").  At the time of the filing of this complaint, the Company faces an almost certain threat of eviction from the Headquarters and Warehouse.

100.    With respect to the Overdue Rent, the Lessor has stated that it intends to require that Hornstrom satisfy this obligation pursuant to the Guaranty.

101.    Hornstrom has informed CCUR Holdings that when the Lessor makes such a demand, he will seek to pass this obligation to CCUR Holdings pursuant to the Assignment.

### FIRST CAUSE OF ACTION
**(CCUR Acquisition's Claim against All Defendants for Contractual Indemnification for Breach of Section 3.05(a) of the Purchase Agreement)**

102.    CCUR Acquisition repeats and realleges each of the allegations set forth in paragraphs 1 through 101 as if fully set forth herein.

103.    The Purchase Agreement is a valid and binding contract between CCUR Acquisition and the Defendants.

104.    CCUR Acquisition has performed all of its material duties and responsibilities pursuant to the Purchase Agreement, including by paying the $4 million purchase price (later reduced to approximately $3.7 million subject to certain adjustments as provided for in the Purchase Agreement).

105.     Pursuant to Section 8.02(a) of the Purchase Agreement, each of the Defendants, on a joint and several basis, are contractually obligated to indemnify CCUR Acquisition for losses caused by any breach of certain R&Ws made by the Sellers.

106.     Pursuant to Section 3.05(a), the Sellers represented that the Financial Statement and Balance Sheet provided to CCUR Acquisition "fairly presents in all material respects the financial condition of [Quick Trip] as of the date it was prepared and the results of the operations of [Quick Trip] for the period indicated."

107.     The Sellers breached this R&W, as the Financial Statement and Balance Sheet did not fairly present in all material respects the financial condition of Quick Trip.

108.     Due to this breach of the R&W, CCUR Acquisition has been damaged in an amount to be determined at trial, but in no amount less than $3.7 million.

109.     CCUR Acquisition is entitled to indemnification from Defendants for this amount pursuant to the Purchase Agreement.

110.     Immediately prior to filing this Complaint, CCUR provided Defendants with written notice of this demand for indemnification.

### SECOND CAUSE OF ACTION
**(CCUR Acquisition's Claim against All Defendants for Contractual Indemnification for Breach of Section 3.05(b) of the Purchase Agreement)**

111.     CCUR Acquisition repeats and realleges each of the allegations set forth in paragraphs 1 through 101 as if fully set forth herein.

112.     The Purchase Agreement is a valid and binding contract between CCUR Acquisition and the Defendants.

113.     CCUR Acquisition has performed all of its material duties and responsibilities pursuant to the Purchase Agreement, including by paying the $4 million purchase price (later

reduced to approximately $3.7 million subject to certain adjustments as provided for in the Purchase Agreement).

114.    Pursuant to Section 8.02(a) of the Purchase Agreement, each of the Defendants, on a joint and several basis, are contractually obligated to indemnify CCUR Acquisition for losses caused by any breach of certain R&Ws made by the Sellers.

115.    Pursuant to Section 3.05(b), the Sellers represented that it did not have any material "liabilities, obligations, or commitments of any nature whatsoever" other than: (i) Liabilities as to and to the extent reflected on the Balance Sheet as of the Balance Sheet Date, (ii) Liabilities incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date, (iii) and obligations not in default under Contracts entered into by the Company in the ordinary course of business consistent with past practice."

116.    The Sellers breached this R&W, as the Balance Sheet stated that Quick Trip had no accounts payable, when in fact this number was over $100,000.

117.    Due to this breach of the R&W, CCUR Acquisition has been damaged in an amount to be determined at trial.

118.    CCUR Acquisition is entitled to indemnification from Defendants for such damages pursuant to the Purchase Agreement.

119.    Immediately prior to filing this Complaint, CCUR provided Defendants with written notice of this demand for indemnification.

**THIRD CAUSE OF ACTION**
**(CCUR Acquisition's Claim against All Defendants for Contractual**
**Indemnification for Breach of Section 3.05(c) of the Purchase Agreement)**

120.    CCUR Acquisition repeats and realleges each of the allegations set forth in paragraphs 1 through 101 as if fully set forth herein.

121.    The Purchase Agreement is a valid and binding contract between CCUR Acquisition and the Defendants.

122.    CCUR Acquisition has performed all of its material duties and responsibilities pursuant to the Purchase Agreement, including by paying the $4 million purchase price (later reduced to approximately $3.7 million subject to certain adjustments as provided for in the Purchase Agreement).

123.    Pursuant to Section 8.02(a) of the Purchase Agreement, each of the Defendants, on a joint and several basis, are contractually obligated to indemnify CCUR Acquisition for losses caused by any breach of certain R&Ws made by the Sellers.

124.    Pursuant to Section 3.05(c) of the Purchase Agreement, the Sellers made the following representation: "[t]he accounts receivable reflected on the Balance Sheet and the accounts receivable arising after the Balance Sheet Date have arisen from bona fide transactions entered into by [Quick Trip] involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice."

125.    The Sellers breached this R&W because the accounts receivable as reflected on the Balance Sheet and thereafter did not accurately reflect bona fide transactions entered into by Quick Trip in the ordinary course of business.

126.    Due to this breach of the R&W, CCUR Acquisition has been damaged in an amount to be determined at trial, but in no amount less than $3.7 million.

127.    CCUR Acquisition is entitled to indemnification from Defendants for this amount pursuant to the Purchase Agreement.

128.    Immediately prior to filing this Complaint, CCUR provided Defendants with written notice of this demand for indemnification.

## FOURTH CAUSE OF ACTION
### (CCUR Acquisition's Claim against All Defendants
### for Contractual Indemnification for Fraud)

129.    CCUR Acquisition repeats and realleges each of the allegations set forth in paragraphs 1 through 101 as if fully set forth herein.

130.    The Purchase Agreement is a valid and binding contract between CCUR Acquisition and the Defendants.

131.    CCUR Acquisition has performed all of its material duties and responsibilities pursuant to the Purchase Agreement, including by paying the $4 million purchase price (later reduced to approximately $3.7 million subject to certain adjustments as provided for in the Purchase Agreement).

132.    Pursuant to Section 8.02(d) of the Purchase Agreement, each of the Defendants, on a joint and several basis, are contractually obligated to indemnify CCUR Acquisition for losses caused by fraud.

133.    As outlined herein, Quick Trip made material and false representations to CCUR during the due diligence process, particularly concerning its financial performance and historical revenues.

134.    These false representations were made with an intent to defraud CCUR, and to extract a larger sales price for Quick Trip.

135.    These misrepresentations were material, as they related to the fundamental financial condition of Quick Trip.

136.    CCUR reasonably relied on these misrepresentations in paying Defendants the $4 million purchase price.

137.    CCUR did not know the representations concerning Quick Trip's financial standing were false.

138.    In contrast, Taylor—and potentially the Sellers—knew the representations to be false and/or misleading.

139.    CCUR has been damaged in an amount to be determined at trial, but in no event less than $3.7 million.

140.    CCUR is entitled to indemnification from Defendants for this amount pursuant to the Purchase Agreement.

141.    Immediately prior to filing the Complaint, CCUR Acquisition provided Defendants with written notice of this claim for indemnification.

## FIFTH CAUSE OF ACTION
### (CCUR Acquisition's Claim against Hornstrom and Richh for Aiding and Abetting Fraud)

142.    CCUR Holdings repeats and realleges each of the allegations set forth in paragraphs 1 through 101 as if fully set forth herein.

143.    As outlined herein, Quick Trip made material and false representations to CCUR during the due diligence process, particularly concerning its financial performance and historical revenues.

144.    These false representations were made with an intent to defraud CCUR, and to extract a larger sales price for Quick Trip.

145.    These misrepresentations were material, as they related to the fundamental financial condition of Quick Trip.

146.    CCUR reasonably relied on these misrepresentations in paying Defendants the $4 million purchase price.

147.    CCUR did not know the representations concerning Quick Trip's financial standing were false.

148.    In contrast, Taylor—and potentially the Sellers—knew the representations to be false and/or misleading.

149.    During the due diligence process, Caparaso, served as an accountant to Quick Trip and provided information to CCUR and access to Quick Trip's books and records.

150.    Hornstrom represented to CCUR that Caparaso was his personal tax accountant and that he had put her in charge of Quick Trip's accounting.

151.    Given Caparaso's background and role, she should have recognized and/or identified the inaccuracies in Quick Trip's books and records and, upon information and belief, knew or should have known that the representations made to CCUR in the due diligence process were false.

152.    As an agent of Hornstrom and/or Richh, Caparaso had a duty to communicate her knowledge of inaccuracies in Quick Trip's books and records to her principal.

153.    Thus, upon information and belief, Hornstrom and/or Richh knew or should have known that the representations made to CCUR in the due diligence process were false.

154.    Caparaso and Hornstrom substantially assisted in the fraud by failing to correct the inaccuracies in Quick Trip's books and records and/or by assisting Taylor in concealing those inaccuracies and presenting false information as part of the due diligence process.

155.    By their substantial assistance, Caparaso and Hornstrom intended to induce reliance by CCUR to close on the acquisition and did so.

156.    As a result, CCUR has been damaged in an amount to be determined at trial, but in no event less than $3.7 million.

## SIXTH CAUSE OF ACTION
### (CCUR Holdings' Claim against Hornstrom for a Declaration
### Pursuant to 28 U.S.C. § 2201 that the Assignment is Voidable and Rescinded)

157.    CCUR Holdings repeats and realleges each of the allegations set forth in paragraphs 1 through 101 as if fully set forth herein.

158.    Hornstrom has asserted that, pursuant to the Assignment, CCUR Holdings is liable for the Overdue Rent.

159.    CCUR Holdings denies that it is liable pursuant to the Assignment because it was fraudulently induced to enter into that contract.

160.    As a result, CCUR Holdings elects to void and rescind the Assignment (both the Letter Agreement and the Assignment Agreement).

161.    An actual and justiciable case and/or controversy thus exists between CCUR Holdings and Hornstrom regarding the enforceability of the Assignment, and the parties' rights, duties, and obligations thereunder.

162.    Accordingly, CCUR Holdings is entitled to a declaratory judgment by this Court pursuant to 28 U.S.C. § 2201 that the Assignment is voidable as a result of fraud in the inducement and that it has been rescinded by CCUR Holdings.

163.    Alternatively, CCUR Holdings is entitled to a declaratory judgment by this Court pursuant to 28 U.S.C. § 2201 that Hornstrom may not enforce the terms of the Assignment.

## REQUEST FOR RELIEF

WHEREFORE, CCUR Holdings and CCUR Acquisition respectfully request the Court:

a) Enter a judgment against Defendants, jointly and severally, awarding damages to CCUR including but not limited to compensatory damages, reasonable attorneys' fees, costs of investigation, and interest, in an amount to be determined at trial, but no less than $3,700,000;

23

b) In the alternative to an award of damages as described above, and because the Sellers fraudulently induced CCUR to acquire Quick Trip and agree to the various contracts associated with such acquisition, enter an order that the Purchase Agreement (and all related contracts) are rescinded, resulting in an unwinding of the transaction including, *inter alia*, a return to CCUR Acquisition of the purchase price along with any reliance damages incurred in connection with the acquisition of Quick Trip;

c) Enter a declaration that the Assignment is voidable and has been rescinded by CCUR Holdings, and therefore CCUR Holdings is not liable to Hornstrom for the Overdue Rent, or for any other obligation pursuant to the Assignment;

d) Award statutory interest, costs, and disbursements of this action, including CCUR's attorney's fees;

e) Award punitive damages for the fraudulent misrepresentations; and

f) Grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
July 1, 2024

DAVIS+GILBERT LLP

By: */s/ Neal H. Klausner*
        Neal H. Klausner
        Daniel A. Dingerson
        Daniel T. Finnegan
        Davis+Gilbert LLP
        1675 Broadway
        New York, New York 10019
        (212) 468-4800
        nklausner@dglaw.com
        ddingerson@dglaw.com
        dfinnegan@dglaw.com

*Attorneys for Plaintiffs CCUR Holdings, Inc., and CCUR Acquisition II, LLC*

24